JAMES A. LANGLEY, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; CRAIG W. O'RILEY AND SANDRA K. O'RILEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Langley v. Commissioner
Docket Nos. 8198-80, 8205-80.
United States Tax Court
T.C. Memo 1982-460; 1982 Tax Ct. Memo LEXIS 290; 44 T.C.M. (CCH) 746; T.C.M. (RIA) 82460; August 5, 1982. Kevin M. Abel,Dennis W. Johnson, and Steven E. Zumbach, *291 for the petitioners. Jack Forsberg, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge: Respondent determined the following deficiencies in these consolidated cases: Docket No.
Petitioner(s)
Year
Deficiency
8198-80
James A. Langley
1977
$266
8205-80
Craig W. O'Riley and
1976
$393
Sandra K. O'Riley
1977
$174
The only issue for decision is whether certain amounts received by petitioners James A. Langley and Craig W. O'Riley pursuant to appointments as graduate research assistants at Iowa State University are excludable from gross income under section 117[1] as scholarship or fellowship grants. The parties agree that if the amounts received by Langley constitute a scholarship or fellowship grant, then the amounts received by O'Riley similarly qualify. Accordingly, our findings of fact and opinion will focus on Langley's activities. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and joint *292 exhibits are incorporated herein by reference. The pertinent facts follow. At the time they filed their petitions in these consolidated cases James A. Langley and Craig W. and Sandra K. O'Riley resided in Ames, Iowa. Petitioner James A. Langley (Langley) timely filed an individual income tax return for the calendar year 1977 with the Internal Revenue Service Center at Kansas City, Missouri. Petitioners Craig W. O'Riley (O'Riley) and Sandra K. O'Riley are husband and wife and filed timely joint individual income tax returns for the calendar years 1976 and 1977 with the Internal Revenue Service Center at Kansas City, Missouri. During 1977 Langley was enrolled in a Ph.D. program in the Department of Economics at Iowa State University (ISU) and was a candidate for a degree as that term is used in section 117(b)(1) of the Internal Revenue Code. During the years 1976 and 1977 O'Riley was enrolled in a masters program in the Department of Economics at ISU and was also a candidate for a degree within the meaning of section 117(b)(1). Both Langley and O'Riley held appointments as graduate research assistants at ISU during the taxable years in issue. ISU *293 is a land-grant college established to provide resident academic instruction and extension education and to conduct and promote research. It qualifies as an educational organization described in section 170(b)(1)(A)(ii) of the Internal Revenue Code. The Graduate College at ISU offers graduate study leading to Ph.D. and certain types of masters degrees. It is responsible for the quality of graduate education, for administering the various graduate programs, and for promoting research support from various governmental, industrial and private agencies. Research plays an important role in the educational process at ISU, and members of the graduate faculty are expected to perform both teaching and research duties. As of 1977, the yearly operating budget for all research conducted at ISU was approximately $32,000,000, with a large portion of those funds derived from contracts and grants from the Federal government and private industry. The objectives of graduate education at ISU include (1) conveying the highest level of knowledge within a field to students (2) teaching them to develop the methods, techniques and procedures for conducting research, (3) assisting *294 them to apply their acquired knowledge and research skills to particular situations, and (4) developing and contributing to the existing body of knowledge in a particular field. In order to meet the objectives of graduate education at ISU it is essential that students develop research skills, and this is particularly true in the Economics Department. These research skills are acquired by having the students actually engage in research activities. They are not automatically acquired simply by completing the regular course work which is a part of the curriculum. In the Ph.D. program candidates must demonstrate their research skills by engaging in a major research project which culminates in the writing of a dissertation. Normally, graduate students in the masters program at ISU are also required to do research and prepare a comprehensive thesis. However, in the Economics Department a candidate for the Master of Science degree can elect a "non-thesis option" which is designed for students who are preparing themselves for administrative positions in economics and do not need an extensive research background. Under the non-thesis option a candidate must complete 54 quarter hours of *295 instruction (versus 45 quarter hours for thesis candidates) and must also complete what is known as the "creative component." The creative component, normally evidenced by some type of written work, is expected to demonstrate a certain degree of creativity and originality in the application of economic theories and methodologies, but it does not require the preparation of a formal thesis and generally involves less depth and creativity than that normally associated with a thesis project. In order to assist students in developing the required research skills, as well as provide a form of financial aid, ISU has established a graduate research assistant (GRA) program whereby appointees work on research projects and receive monthly stipends. The assistantships are made available only to students graduating from approved undergraduate institutions in the top quarter of their respective classes. In order to receive an appointment an eligible student must also demonstrate (normally to his faculty advisor or "major professor") that he has the necessary academic background and preparation to handle research activities. Students registered on a restricted or nondegree basis and those placed *296 on academic probation are not eligible for an appointment. A description of the GRA program and its objectives appears in the August 1976 edition of the ISUGraduate Student Handbook: Graduate Research Assistantships
A graduate research assistant does research under the supervision of the professorial staff to develop not only technical and manipulative skills but also to foster originality, imagination, judgment, and patience -- the traits of the independent scholar. Many times a research project to which the research assistant is assigned will eventually lead to a thesis or dissertation topic. Although a research supervisor cannot guarantee that a particular project will be suitable thesis material, the supervisor can offer a professional judgment as to whether the project is suitable, and he/she should offer this judgment to the RA as soon as feasible. The final decision on the acceptability of a research topic for the thesis or dissertation rests with the student's advisory committee. Because of the widely varying demands of research duties, it is nearly impossible to set a specific work week. The official University guideline is 20 hours per week for half-time *297 service, but it should be viewed as minimal. Since a graduate research assistantship is an apprentice position designed to offer an educational research experience to a person who is primarily a student, the position should not be regarded as a prelude to the research associate position, which is a regular appointment. After receiving an appointment, the GRA meets with his major professor to determine a suitable research project for him to work on. The policy of the Graduate School is that the project should be compatible wit the student's interests and academic background and present an opportunity for original research. Ideally, the results of the research should be incorporated in the student's masters thesis or doctoral dissertation. As the research proceeds, the major professor is expected to give counsel and direction to the student in order to minimize unproductive and misguided research effort. The ISU Graduate School also provides a research position known as a research associate. Research associates are hired to perform specific research services on projects which the University contracts to perform for outside agencies or private industry. In contrast to the research *298 assistant, who is in the process of developing his research skills and uses the research assistantship as a type of training or proving ground, the research associate generally has greater knowledge and experience and is expected to perform his assigned research task without additional training. He also receives more money than a research assistant. In the fall quarter of 1976 there were 3,263 on-campus graduate students enrolled at ISU and 716 of them held GRA appointments. In the fall quarter of 1977 these figures were 3,305 and 758, respectively. Petitioner Langley received his undergraduate degree with honors from McMurray College in 1976. He majored in economics and developed a special interest in agriculture and food production policy. In September 1976 he enrolled in the Ph.D. program in the Economics Department at ISU. Dr. Earl Heady was assigned as his academic advisor. Dr. Heady has been a professor at ISU for over 30 years and is considered an expert in agricultural economics and food production policy. He has also done a great deal of work in the development and application of statistical and quantitative methods and models. Langley expressed to Dr. Heady *299 an interest in the GRA program because he was convinced that a research assistantship would be highly beneficial to his graduate education and would provide him an opportunity to do research in his area of interest. In addition, he was also in need of money to help meet his tuition payments. After interviewing Langley and evaluating his interests, past experience and academic record, Dr. Heady decided to assist him in getting a GRA appointment. He went to the Director of Graduate Studies in the Economics Department and suggested that Langley should be given a half-time assistantship. The Director agreed, and Langley received an appointment in March 1977. After consulting with Dr. Heady on suitable research topics, Langley commenced research on the regional and national implications of a complete switch to organic farming conditions in which all chemical and commercially processed fertilizers are removed from the production process. During the course of his work Langley learned and applied a number of different research skills, including data collection, computer programming, and the mathematical and statistical techniques of linear programming and econometric models. All of *300 these skills were basic tools which were necessary for him to pursue his graduate studies in agricultural economics and complete his doctoral dissertation. Dr. Heady felt that the research opportunity provided by the assistantship was particularly important for Langley's development, because he believed Langley to be at a relatively low level of accomplishment in the use of econometric models. During the course of his appointment Langley frequently consulted Dr. Heady for advice and direction on his project. However, these sessions were informal in nature and not conducted according to any set time schedule. Langley was not required to submit any written periodic progress reports. His research activities were not subject to the direction or control of any party outside the Economics Department, and he was not obligated to provide to any outside party the products of his research. Langley's GRA appointment specified a minimum of 20 hours a week of research activity. Fulfillment of this requirement was left to Langley's discretion, and his research schedule varied from week to week during the year. Some weeks he exceeded the minimum requirement and other weeks he fell short *301 of it. On the average, however, he worked 30 to 35 hours per week on his research project, even though he received no additional money for the excess hours worked. Langley's research on the organic farming project continued into 1978. Upon the approval of Dr. Heady, Langley received academic credit hours in 1978 on account of his research activities in 1977 and 1978. These hours helped him satisfy the 108 quarter-hour requirement of the Ph.D. program. The results of Langley's research on organic farming have been incorporated in a research paper and an article which is expected to be published in an agricultural journal. The article is co-authored by Langley, Dr. Heady and another professor who worked on the project. The research data did not form a part of Langley's doctoral dissertation, which is tentatively titled "Regional Econometric Simulation Model for the Analysis of Agricultural Policies for Major U.S. Crop Commodities." However, in conducting the research for his dissertation, Langley made considerable use of the research techniques which he learned in the course of his GRA appointment. Like many other professors in the Economics Department, Dr. Heady has a joint *302 appointment pursuant to which he is required to divide his time equally between teaching and research activities. As a result, he generally has a number of different research projects in progress at any given time. In order to secure funding for a particular project, Dr. Heady is required to draft a research proposal setting forth the subject of the project, the methodology to be used, and a project budget. The budget is supposed to include an estimate of the amount of money which may be needed to staff the project with research assistants and/or research associates. A research proposal is required regardless of whether the project is to be funded from outside sources, such as governmental agencies or other organizations, or from ISU general funds which have been allocated to research. Each year ISU budgets a specified amount of money for general research and allocates those funds to the various academic departments. Part of these funds are used by the departments for research assistantships. Research proposals within each department do not have to be approved by the ISU Business and Finance Office. Instead, the approval authority is lodged with the individual college deans *303 and department heads. On the other hand, if the proposed research project is to be financed from outside sources, the Business and Finance Office normally performs a review to determine if the project is feasible from a budgetary, as opposed to an academic, point of view. During the first half of 1977 Langley's GRA appointment was funded by a grant from the National Science Foundation. During the latter half of 1977 it was funded from the general University research budget provided by the State of Iowa. During the 1976-77 academic year ISU set the minimum stipend for half-time teaching and administrative assistants at $365 per month and $320 per month for half-time research assistants. The maximum permissible stipends were $520 per month for half-time teaching and administrative assistants and $485 per month for half-time research assistants. Research assistants were paid less than teaching and administrative assistants because ISU did not withhold income taxes from the paychecks of research assistants. Research assistants who were appointed on a full-time basis (40 hours per week) were paid on a scale ranging from $640 per month to $970 per month. During 1977 Langley received *304 a monthly stipend of $400 and his total payments were $3,920. Research assistants who are appointed on more than a quarter-time basis are subject to a reduced limitation on the number of credit hours they may carry during the quarter. Normally the maximum load is 15 credits per quarter, but with a half-time appointment the limitation is set at 11 credits. Students with full-time appointments are limited to 5 credits per quarter. In addition, students may hold greater than half-time appointments for no more than one quarter per year. All disbursements of funds to individuals employed or affiliated with ISU are made through a central payroll office. The funds received by graduate research assistants are disbursed through this office in the same manner as compensation paid to regular employees because the established payroll system is efficient, accurate and economical. Consequently, payments to research assistants are accounted for on salary payroll vouchers similar to those used for regular employees.
Research assistants are not allowed to participate in the ISU life insurance, disability insurance and retirement plans. They are permitted to participate in the ISU health *305 insurance plan, but, unlike full-time employees, whose premiums are paid in full by the University, research assistants are required to shoulder the cost of the premiums subject only to a modest reduction which reflects plan dividends received by the University as an experience rebate on the premiums paid. In other words, ISU's costs are not increased by the participation of research assistants in the health plan. Research assistants are permitted time off with pay for sick leave, vacation and holidays. However, this arrangement is used by the University as a control mechanism to insure that the student is primarily on-campus and progressing in his academic research activities. If a research assistant withdraws from the University, he does not receive any payments for accrued sick leave or vacation time, in contrast to other University employees. ISU contributes to the State Workmen's Compensation Insurance Fund and Unemployment Insurance Fund with respect to its employees. Such contributions are not made with respect to research assistants. ISU also collects and pays social security taxes and withholding taxes with respect to the compensation of its employees, but such payments *306 are not made with respect to the funds received by research assistants. Unlike research assistants, research associates are provided some fringe benefits and the University pays social security and withholding taxes with respect to their salaries. ULTIMATE FINDING OF FACT Langley was paid to study, not to work, and the monthly stipend he received pursuant to his appointment as a graduate research assistant constitutes a scholarship or fellowship grant. OPINION Section 117(a)(1) provides, as a general rule, that any amount received as a scholarship or fellowship grant is excludable from gross income. Although the terms "scholarship" and "fellowship grant" are not defined in the statute, section 1.117-3, Income Tax Regs., defines them as amounts paid to an individual to aid him in his studies or research. Further amplification is found in section 1.117-4(c)(2), Income Tax Regs., which states that amounts paid to an individual to enable him to pursue studies or research will qualify "if the primary purpose of the studies or research is to further the education and training of the recipient in his individual capacity." The regulation also provides that "neither the fact *307 that the recipient is required to furnish reports of his progress to the grantor, nor the fact that the results of his studies or research may be of some incidental benefit to the grantor shall, of itself, be considered to destroy the essential character of such amount as a scholarship or fellowship grant." No exclusion is permitted, however, if the amount paid "represents either compensation for past, present, or future employment services or represents payment for services which are subject to the direction or supervision of the grantor." Section 1.117-4(c)(1), Income Tax Regs. In Bingler v. Johnson,394 U.S. 741, 751 (1969), the Supreme Court upheld the validity of this regulation, stating that: [T]he definitions supplied by the Regulation clearly are prima facie proper, comporting as they do with the ordinary understanding of "scholarships" and "fellowships" as relatively disinterested, "no-strings" educational grants, with no requirement of any substantial quid pro quo from the recipients. Thus, the key question is whether the primary purpose for making the payments was to enable the recipient to pursue study or research to further his education or training, *308 or whether it was to compensate him for past, present or future services. Steiman v. Commissioner,56 T.C. 1350, 1354 (1971). More simply put, was the individual paid to study or paid to work? Zolnay v. Commissioner,49 T.C. 389, 396 (1968). This is purely a question of fact. Mizell v. United States,663 F.2d 772 (8th Cir. 1981). We are convinced that the only purpose of the payments was to further Langley's education and training, and that they were not in the nature of compensation for services rendered. A number of factors support this conclusion. First, the development of research skills is considered an essential part of graduate education at ISU, and the GRA appointments provide a means for acquiring these skills through financially assisted research. The selection of a suitable research project is done in close consultation with the student's major professor to insure that the project offers an opportunity for original and creative research which is commensurate with the student's capabilities. Often--and preferably so, from the standpoint of the Graduate School--the research is incorporated in the student's masters *309 thesis or doctoral dissertation. Although this was not true in Langley's case, the record makes it clear that the skills he acquired in the course of his appointment, particularly those relating to the use of econometric models, were nevertheless essential to the conduct of the research for his dissertation. Moreover, Langley also received academic credit hours for his research which were applied against the 108 total hours needed to complete the Ph.D. program. Thus, he derived clear and unmistakable educational benefits from his research assistantship. Second, we note that although Langley was required to work 20 hours a week on his research project, he actually averaged 30 to 35 hours a week and received no additional funds for the extra time spent. This is certainly inconsistent with a true employment relationship where one might reasonably expect to be compensated for overtime. Third, the review of Langley's research by his major professor, Dr. Heady, was informal, consisting of periodic conferences during which he apprised Dr. Heady of his progress and received suggestions regarding the direction, design and scope of his project. In substance, Dr. Heady served more in *310 the capacity of an advisor than a supervisor, and there was a distinct absence of an employer-employee relationship in the traditional sense. Fourth, Langley was not required to turn over the results of his research to any persons outside the Economics Department.Nor was he under any sort of contractual commitment to perform specific research activities. Compare Zolnay v. Commissioner,supra at 397. The money used to fund his appointment came from the ISU general research budget and a grant from the National Science Foundation, and the record does not reveal any strings attached to the use of those funds.In other words, Langley was not obliged to tender a finished product conforming to the specifications of an interested third party. He reported solely to Dr. Heady, who was responsible for approving his research as eligible for academic credit.Even Dr. Heady did not require periodic written progress reports detailing the results of his research to date.All of this tends to belie the existence of any quid pro quo which would pervade the typical compensatory arrangement. Fifth, testimony by Dr. John Timmons, who is also a professor in the Economics Department *311 and served as Chairman of the Reviewing Committee of the Graduate School, indicates that in addition to fostering the development of research skills, another major objective of the GRA program was to provide eligible graduate students with financial aid. Langley also testified that he looked upon the assistantship as a badly needed source of financial assistance to help meet his tuition payments. We think these facts provide a further indication that noncompensatory motives were characteristic of the GRA program. Sixth, there are several other facts which, although we do not give them a great deal of weight, indicate that many of the trappings associated with an employment relationship are absent in this case. For instance, GRAs are not entitled to any fringe benefits, in contrast to other full-time employees of ISU. They are permitted to participate in the University health insurance program, but only at their own expense; their participation costs ISU nothing. Furthermore, while it is true that GRAs are entitled to paid holidays, vacation and sick leave, we note that this is done primarily for administrative reasons to help keep the student on campus and fully engaged in *312 his research during the period of the appointment. This is borne out by the fact that students who withdraw from the University do not receive any payments for accrued vacation or sick leave. Finally, ISU made no contributions to the State Workmen's Compensation Insurance Fund or Unemployment Insurance Fund on account of its GRA appointees, nor did it collect or pay social security or withholding taxes on their stipends. Just the opposite, of course, holds true for regular employees of the University. We recognize that ISU nominally treated research assistants as employees in its computerized payroll system, and that they were paid with standard payroll vouchers. However, this was done in the interests of convenience and economy and its probative value is negligible. See Steiman v. Commissioner,supra at 1356. In the final analysis, respondent's case rests entirely on his argument that ISU has a dual mission, i.e., to educate its graduate students and conduct and promote research, and that the latter goal cannot be accomplished without the services of research assistants.In support he relies on the following: (1) ISU received $32,000,000 in public and *313 private funds for research during 1977, (2) most of its professors were required to perform both teaching and research duties, and (3) research assistants worked on projects arranged by their professors. In effect, respondent uses these facts to elevate research activities to the level of a separate, distinct and independent University function, with research assistants playing the role of "assembly line workers" in what he apparently considers to be a "research factory." We, like the petitioners, think that respondent's attempt to divorce research activities from the educational process sets up a false dichotomy. The record establishes, and common sense would seem to indicate, that research at ISU is part and parcel of its educational mission. As Dr. Heady testified, "You can't separate research and education, particularly at the graduate level." While it is true that Dr. Heady was engaged in a number of different projects on which some of the research was performed by research assistants, the fact remains that the Graduate School regarded the assistantships as "basically a training position and a training device," to use the words of Dr. Timmons. We think there is ample evidence *314 in the record to support this characterization. [2]
On the basis of the foregoing, we hold that the amounts received by Langley and O'Riley were not intended as compensation for services, but rather were intended to facilitate their graduate education. Thus, the amounts qualify as scholarship or fellowship grants under section 117(a). [3]
*315 Having concluded that the payments were in the nature of a scholarship or fellowship grant, we next address respondent's alternative ground for disallowance, which is premised on section 117(b)(1). That section provides that in the case of an individual who is a candidate for a degree, no exclusion is permitted under section 117(a) with respect to amounts received for "teaching, research, or other services in the nature of part-time employment required as a condition to receiving the scholarship or fellowship grant." This limitation does not apply, however, where the services are required of all candidates as a condition to receiving a particular degree. This is commonly referred to as the "equivalent services" exception to the general rule of section 117(b)(1). Respondent seems to assume that petitioner is doomed under section 117(b)(1) unless he comes within this exception. We disagree. We have already concluded that the stipends received by the petitioners were only educational in nature, and that there was no expectation of any quid pro quo in return. To put it another way, the payments were not intended to compensate petitioners for services rendered in an employee *316 or any other capacity. It logically follows, then, that the research assistantships were not "in the nature of part-time employment" within the scope of section 117(b)(1). Hence, it is not necessary to determine whether the "equivalent services" exception to the limitation applies. Accordingly, we hold for petitioners. Decisions will be entered for the petitioners in both dockets.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue, unless otherwise indicated.↩
2. Respondent's argument would be somewhat more persuasive if made in the context of ISU research associates. They are hired by ISU to perform specific tasks on specific research projects, including projects which the University has contracted to carry out for the benefit of interested third parties, such as governmental agencies. Unlike research assistants, research associates generally have more knowledge and experience and are expected to know how to perform their assigned tasks before they start. They are also paid more money than research assistants and receive certain fringe benefits which the latter do not. The presence of a quid pro quo↩ is more likely in this situation, but that is not our concern here.
3. For other cases where research assistants were permitted to exclude their stipends under facts similar to those presented here, see Bhalla v. Commissioner,35 T.C. 13 (1960); Pozar v. Commissioner,T.C. Memo. 1980-559; Chen v. Commissioner,T.C. Memo. 1979-407↩.